| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18 C 06975 |
| v. ) | |
| ) | Judge Edmond E. Chang |
| JOHN L. PHILLIPS ) | |

## MEMORANDUM OPINION AND ORDER

Law enforcement officers stopped and searched Defendant John Phillips' car without a warrant on two different occasions. Both times, the officers recovered guns and ammunition from the car. Ultimately, Phillips was charged with dealing firearms without a federal firearm license, transferring firearms to out-of-state residents, and being a felon in possession of a firearm. Phillips has moved to suppress all evidence obtained as a result of those searches, arguing that the stops and seizures violated the Fourth Amendment.[1] R. 69, Mot. Suppress 7/9/17 Stop; R. 102, Mot. Suppress 8/24/17 Stop. One of the motions required an evidentiary hearing to resolve, during which the Court heard witness testimony, reviewed video evidence, and received other evidence into the record. R. 153, 12/2/19 Order. For the reasons discussed in this Opinion, the Court denies both motions.

## I. Background

On July 9, 2017 and then again on August 24, 2017, law enforcement officers stopped Phillips for what the officers believed were traffic-related violations. As a result of both stops, law enforcement obtained firearms and ammunition from

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331. Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

Phillips' white 2016 Dodge Challenger. Phillips moves to suppress the evidence obtained during both stops. The factual details of the stops are set forth next and are based on video recordings from squad-car dash cameras; officer body cameras; reports and affidavits of the Chicago Police Department (CPD), the Bureau of Alcohol, Tobacco, and Firearms (ATF), and the Illinois State Police (ISP); and in-court testimony.

### A. July 9, 2017

On the evening of July 9, 2017, Chicago Police Officers Butkovic and Farias were patrolling the area of 6043 South Throop Street, where there had been earlier reports of gun shots. R. 69-1, Def.'s Exh. 1, Phillips Arrest Report at 2; R. 69, Def.'s Exh. 2, 7/9/17 Squad Car Video. The officers were patrolling this area in case there was any retaliation in response to the shots fired, and to locate possible offenders. Below is a satellite map of the area that the officers were patrolling that night:



R. 150, Gov.'s Exh. 2, Map.

As they patrolled the area, the officers drove northbound down the north-south alley located east of the house on 6043 South Throop (in the map, the alley is between Throop and Elizabeth Streets, running parallel to those streets). 7/9/17 Squad Car Video at 00:00-10; *see also* Map. Both Officers Farias and Butkovic testified that, while driving north through the alley, they approached a vacant lot, across from which they noticed a white Dodge Challenger driving southbound on Throop Street. Butkovic testified that the Challenger caught his attention because it was a high-performance vehicle, and based on his experience, those types of vehicles are commonly used in shootings and are also commonly stolen.[2] When Butkovic first noticed the car, the officers were around halfway down the alley and near a garage, somewhere between 5 to 10 seconds into the squad car video. 7/9/17 Squad Car Video at 00:10.

After noticing the Challenger, Farias made a left turn into the vacant lot and drove through it toward Throop. 7/9/17 Squad Car Video at 00:11-30. Based on the squad-car video, it took around 19 to 21 seconds to cross the lot. *Id*. During that time, the officers could not see the Challenger, which had continued southbound down

___

[2]Farias provided a different reason for noticing the Challenger. He testified that he noticed the car because it was traveling at a high rate of speed. In contrast, Butkovic testified that he did not remember that the car was speeding. Farias's testimony on this point was not persuasive: during the cross-examination of Farias, defense counsel pointed out that there was a speed bump on Throop near where Farias would have seen the Challenger speeding. When defense counsel asked whether Farias had seen the Challenger hit the speed bump, Farias speculated that there might have been another car blocking his view. But after reviewing the squad-car video, Farias admitted there was no car blocking his view. In light of this and other concerns with the accuracy of Farias' testimony, the Court is primarily relying on Butkovic's testimony for the key point that Butkovic saw the Challenger pull into the parking spot without a turn signal.

Throop. Then, as the squad car approached the end of the lot, just before turning left on Throop, the officers testified that they saw the Challenger again. Butkovic testified that, as the officers began to turn onto Throop, he saw the Challenger pull up alongside the curb without using a turn signal. According to Butkovic, this occurred at around 30 seconds into the squad-car video. The squad-car video, however, does not show the parking maneuver or the failure to use a turn signal. *See* 7/9/17 Squad Car Video at 00:30. Instead, the Challenger appears in the squad-car video for the first time at around 32 seconds into the video, at which point the car is already stopped along the left curb line—though its brake lights are still illuminated. 7/9/17 Squad Car Video at 00:32-36. The taillights of the car then flash briefly in the video as the gears are shifted to park. *Id.* As detailed later in the Opinion, the circumstantial evidence standing alone would be a close call on whether the officers saw the Challenger pull to the curb (without a signal) versus whether the Challenger was already stopped at the curb. But the Court is convinced by Officer Butkovic's in-court testimony: he testified credibly, forthrightly, and calmly throughout both his direct examination and cross examination, and he conceded when he did not remember facts about that night.

Officers Farias and Butkovic then initiated a traffic stop at around 9:53 p.m., pulling up alongside and then behind the Challenger. 7/9/17 Squad Car Video at 00:36-1:02. After pulling up behind the Challenger, Farias approached the driver's side of the car and asked the driver to lower his window. R. 69, Def.'s Exh. 3, Farias Body Camera Video at 00:30-42. Inside the car were two men: Phillips, the driver;

and Byron Moore, who was sitting in the passenger seat. *Id.* at 00:46. Farias then asked Phillips for his license and proof of insurance. *Id.* at 00:47-48. As Phillips looked for those documents, Phillips asked Farias why he had been stopped. *Id.* at 00:48-58. Farias told Phillips that he failed to use a turn signal as he pulled into the parking spot. *Id.* at 00:59-01:05. Phillips did not dispute Farias' claim and continued to look for the license and insurance card. *Id.* at 01:05-09. Phillips told Farias that Phillips and Moore were in the area after the mother of Moore's child notified them about the gun shots in the area. *Id.* at 01:23-28. During the conversation with Farias, Phillips was generally calm and responsive. *Id.*

Meanwhile, Officer Butkovic stood on the passenger side of the Challenger. 7/9/17 Squad Car Video at 1:10-3:14. After receiving and reviewing Phillips' driver information, Farias then joined Butkovic on the passenger side of the car and asked Moore for identification. Farias Body Camera at 02:40. After asking Phillips and Moore a few more questions, the officers returned to their car to run a name check on both individuals, at which time they discovered that Moore had an outstanding arrest warrant. *Id.* at 05:17-06:53; R. 90-1, Gov.'s Exh. 1, Moore Arrest Warrant.[3] So the officers asked Moore to step out of the car, patted him down, and then arrested him. Farias Body Camera Video at 07:23-08:11; R. 90, Gov.'s Exh. 4, Butkovic Body Camera Video at 07:50-08:42. Farias then asked Phillips to step out of the car to talk to him. Farias Body Camera Video at 08:24-26. Meanwhile, Butkovic searched Moore and found a loaded magazine in his pocket. Butkovic Body Camera Video at 10:12-

[3]Initially, Phillips argued that Moore did not have an outstanding arrest warrant, Mot. Suppress at 2, but later abandoned the argument, Def.'s Reply Br. at 3 n.1.

30. After being notified about the magazine, Farias also placed Phillips in handcuffs and conducted a pat down. Farias Body Camera Video at 10:48-11:50. Farias then proceeded to search the car; this search happened at around 10:03 p.m., which was 10 minutes after the officers' initially approached Phillips and Moore. *Id.* at 11:50-15:48. Farias eventually found ammunition and two firearms in the car. *Id.*; Def.'s Exh. 1, Phillips Arrest Report at 2. Phillips was issued a citation for two traffic violations: (1) failure to signal while changing lanes, Municipal Code of Chicago § 9-40-200(a); and (2) failure to dim lights while parked, Municipal Code of Chicago § 9-76-090(a)). *Id.*

## B. August 24, 2017

The second traffic stop happened almost two months later, on August 24, 2017, and was done in connection with the ATF's investigation of Phillips.[4] In the summer of 2017, the ATF was investigating Phillips for the unlawful trafficking of firearms from Kentucky to Chicago. R. 110-1, Gov.'s Exh. 1, Warrant Application, Vachy Warrant Affidavit ¶ 4. As detailed next, the ATF believed that Phillips, who is a convicted felon, and his co-defendant, Christopher Henderson, were buying guns in Kentucky and reselling them in Chicago. *Id.* The ATF further believed that Phillips and Henderson used a 2016 white Dodge Challenger registered to Phillips with license plate number Z249675 to get to and from Kentucky and to transport the firearms. *Id.* ¶¶ 5-6. During the course of the investigation, ATF agents interviewed

---

[4]Phillips posted bond from the July 9 arrest and regained possession of the Challenger on around July 10, 2017. R. 110-1, Gov.'s Exh. 1, Warrant Application, Vachy Warrant Decl. ¶ 17.

dozens of private gun sellers about firearm sales that took place in Kentucky. R. 1, Complaint, Vachy Complaint Affidavit ¶¶ 47-96. Those sellers identified Phillips and Henderson as the buyers who purchased firearms from them. *Id.* ¶¶ 68, 74, 79, 84. Many also identified the Challenger as the car used during the gun deals. Vachy Warrant Affidavit ¶¶ 11, 14, 16, 19, 20.

In light of this information, on August 10, 2017, the ATF obtained a court order authorizing the placement of a GPS tracking device on the Challenger. *See* Warrant Application. The ATF installed the tracker on the car. R. 141-1, Gov.'s Exh. 8, Report of Investigation No. 22. At that point in the investigation, the ATF had gathered information linking the Challenger to at least seven unlawful firearm deals that occurred between January 17, 2017 and July 6, 2017. Vachy Affidavit ¶¶ 8-22. In addition to that information, the ATF knew about the guns recovered during Phillips' July 9, 2017 traffic stop and had traced parts of one of those guns back to Kentucky. *Id.* ¶¶ 17-18.

Here are details of the facts that the ATF had about the Challenger at the time:

- On January 17, 2017, Individual C acted as a straw buyer for Phillips by purchasing two pistols for Phillips from a gun store in Kentucky. Individual C said that Phillips drove the buyer to the gun store and paid the buyer $200 to purchase firearms on Phillips' behalf. When shown a photograph of the Challenger, Individual C identified it as resembling the car that Phillips used to drive Individual C to the gun store. Vachy Warrant Affidavit ¶ 12.

- On February 16, 2017, Individual B sold a pistol to Henderson in Kentucky. Before the deal, Individual B received an email informing him that Henderson would be arriving to the deal in a "white Challenger." Individual B stated that Henderson did arrive in a Dodge Challenger. CPD recovered the pistol during the execution of a search warrant in Chicago on March 28, 2017. *Id.* ¶¶ 8-9, 11.

- On February 16, 2017, Individual D sold a pistol to Henderson in Kentucky. Individual D believed that Henderson arrived at the deal in a white Dodge Challenger. When shown a photograph of the Challenger, Individual D identified it as the car that Henderson drove to the deal. CPD recovered this pistol from a car in Chicago on May 17, 2017. *Id*. ¶¶ 13-14.

- On March 16, 2017, Individual I sold a pistol to Henderson in Kentucky. Individual I believed that Henderson arrived in a newer model white Dodge Charger. When shown a photograph of Phillips' Challenger, Individual I identified the car as a Dodge Challenger, but insisted that Henderson arrived in a *Charger*. In a later interview, Individual I described the car as a white, late model American "muscle car." CPD recovered the pistol that Individual I sold to Henderson from a car in Chicago on May 6, 2017. *Id*. ¶ 22; R. 141-2, Gov.'s Exh. 9, Report of Investigation No. 2; R. 141-3, Gov.'s Exh. 10, Report of Investigation No. 13.

- On May 6, 2017, Individual G sold a pistol to Henderson in Kentucky. Before the deal, Individual G received a text message saying that the buyer would arrive to the deal in a "white Challenger." Individual G said that Henderson did arrive in a white Dodge Challenger, and that Individual G observed Henderson place the pistol in the trunk of the car. CPD recovered a firearm containing the slide and barrel from that pistol from the Challenger during the July 9, 2017 traffic stop. Vachy Warrant Affidavit ¶ 20; R. 141-4, Gov.'s Exh. 11, Report of Investigation No. 21.

- On May 28, 2017, Individual E sold a pistol to someone who identified himself as "Chris Hendridge" in Kentucky.[5] Individual E stated that "Hendridge" drove a white Dodge Challenger to the deal. When shown a photograph of the Challenger, Individual E identified it as the car used for the deal. CPD recovered that pistol from a gangway in Chicago on June 10, 2017. Vachy Warrant Affidavit ¶¶ 15-16.

- On July 6, 2017, Individual F sold a pistol to Henderson in Kentucky. Individual F stated that Henderson arrived at the deal in a white Dodge Challenger. When shown a photograph of the Challenger, Individual F identified it as the car Henderson drove to the deal. CPD recovered a firearm containing the frame from this pistol from the Challenger during the July 9, 2017 traffic stop. *Id*. ¶¶ 17-19.

- In August 2017, ATF learned that the Indiana State Police conducted an unrelated traffic stop of the Challenger on January 24, 2017. The trooper identified Henderson as the driver of the car, and Phillips as the front seat

---

[5]Individual E did not positively identify Henderson as the buyer from a photo array.

passenger. After obtaining consent to search the Challenger, the trooper found a book bag containing between $5,000 and $10,000 in cash. According to the trooper, Henderson and Phillips gave conflicting accounts about the owner of the cash. R. 110-6, Gov.'s Exh. 6, Report of Investigation No. 35.

On August 22, 2017, the tracking device showed that the Challenger left Illinois, stopped twice in Indiana, and then arrived in Louisville, Kentucky on that same day. R. 110-2, Gov.'s Exh. 2, Report of Investigation No. 34 ¶¶ 1-2. Surveillance video footage showed that Phillips drove the Challenger and that co-defendant Henderson accompanied Phillips as the passenger in a red Nissan Sentra. *Id.* ¶ 3. Two days later, while conducting surveillance, law enforcement saw the Challenger parked in the parking lot of a Louisville hospital at 7:00 a.m. R. 141-4, Gov.'s Exh. 12, Report of Investigation No. 30 ¶ 1. At around 10:32 a.m., agents saw Phillips leave the hospital and walk towards the Challenger. *Id.* ¶ 2. When he got to the Challenger, Phillips opened the passenger door and then looked around the area. *Id.* Two minutes later, a gray Chevrolet Impala entered the hospital parking lot and parked in front of the Challenger. *Id.* ¶ 3. An unidentified man got out of the Impala and approached Phillips. *Id.* Phillips removed something from the Challenger and placed it in the front seat of the Impala. *Id.* Phillips then got back into his car, sat in the passenger seat for a few minutes, and then walked back into the hospital. *Id.* Meanwhile, the unidentified male looked around the parking lot before getting back into the Impala and leaving. *Id.* ¶¶ 3-4.

A few hours later, at around 1:00 p.m., the tracking device showed the Challenger driving northbound toward Illinois. Report of Investigation No. 34 ¶ 4. Four hours later, one of the lead ATF investigators, Officer Ramiro Montes, contacted

Illinois State Police Trooper Timothy Mayerbock and requested assistance with conducting a traffic stop of the Challenger. R. 141-6, Gov.'s Exh. 13, Montes Affidavit ¶ 6; R. 141-7, Gov.'s Exh. 14, Mayerbock Affidavit ¶ 3-4. Montes notified Trooper Mayerbock that the Challenger was part of an ongoing federal firearms investigation. *Id*. Montes explained that, according to the tracking device, the Challenger was traveling from Kentucky to Illinois. Montes Affidavit ¶ 6; Mayerbock Affidavit ¶ 4. Montes provided descriptions of the Challenger and the red Nissan and advised that the cars could be occupied by Phillips or Henderson. Montes Affidavit ¶ 6; Mayerbock Affidavit ¶ 4. Montes also provided personal identifiers for Phillips and Henderson and informed Mayerbock that Phillips was a convicted felon. Montes Affidavit ¶ 6; Mayerbock Affidavit ¶ 4. Montes reported to Mayerbock that, based on the investigation, he believed that Phillips and Henderson were transporting firearms from Kentucky to Illinois. Montes Affidavit ¶ 6. Montes informed Mayerbock that Phillips participated in an exchange with an unidentified individual earlier that day in Kentucky, but that it was unknown whether the exchange involved firearms or narcotics. *Id*. Montes explained that it thus was not known whether any firearms were actually in the Challenger. *Id*.; Mayerbock Affidavit ¶ 4. Mayerbock agreed to assist. To preserve the integrity of the ongoing investigation, Montes requested that Mayerbock develop his own probable cause to stop the Challenger. Montes Affidavit ¶ 6; Mayerbock Affidavit ¶ 4. Montes then relayed the same information to another ISP trooper, Anthony Muzzillo, who agreed to assist with his drug-detection canine partner, Maverick. Montes Affidavit ¶ 7.

Eventually, Muzzillo saw the Challenger driving northbound on Interstate-294. Montes Affidavit ¶ 9; Mayerbock Affidavit ¶ 5. Muzzillo, Mayerbock, and Montes then began following the Challenger. Montes Affidavit ¶ 10, Mayerbock Affidavit ¶ 5. The Challenger got off the interstate when it reached the Roosevelt Road exit, and the car then drove eastbound. R. 110-1, Gov.'s Exh. 7, ISP Field Report at 5; Mayerbock Affidavit ¶ 5. While following the Challenger, Mayerbock observed the Challenger commit what he believed to be several traffic violations. Specifically, Mayerbock saw the Challenger come into close proximity with the car in front of it as it was merging lanes, not allowing a safe distance of operation. R. 110, 8/24/17 Squad Car Video at 07:09:24-7:10:00. The Challenger then continued to follow closely behind the car in front of it. 8/24/17 Squad Car Video at 07:13:00; ISP Field Report at 5. After that, the Challenger swerved over a solid-line lane designator as it entered the left turn lane. 8/24/17 Squad Car Video at 07:24:00.

Believing that the Challenger had committed two traffic violations, *see* R. 110-5, Gov.'s Exh. 5, Written Warning, Mayerbock initiated a traffic stop and pulled the Challenger over at around 5:49 p.m. ISP Field Report at 3, 5. After asking for identification, Mayerbock confirmed that the driver of the Challenger was Phillips. 8/24/17 Squad Car Video at 07:46:00; ISP Field Report at 5. While talking to Phillips, Mayerbock noted that Phillips appeared nervous and was communicating his location to another person over FaceTime on his phone. *Id*. at 5, 15. Based on those observations, Mayerbock requested that Phillips get out of the car while Mayerbock ran Phillips' license. *Id*. Mayerbock told Phillips that he would only write him a

warning[6] and then Phillips would be free to leave. 8/24/17 Squad Car Video at 08:06:00. Despite this offer, however, Phillips refused to get out even after several requests; Phillips eventually complied. *Id.* at 08:08:00. All the while, Phillips continued to use his cell phone to communicate with another person. *Id.* at 08:54:00.

Meanwhile, Trooper Muzzillo arrived on the scene with canine Maverick. 8/24/17 Squad Car Video at 09:04:00; ISP Field Report at 3. Seconds after Phillips finally agreed to get out of the car, Muzzillo instructed Maverick to conduct a free-air sniff of the Challenger; this was around three minutes after the stop was initiated. 8/24/17 Squad Car Video at 07:38:35-09:04:43; ISP Field Report at 3. R. 110-3, Gov.'s Exh. 3, Muzzillo Report at 1. Shortly after, Maverick alerted Muzzillo that there were drugs in the car. Muzzillo Report at 1-2. So the troopers searched the Challenger. ISP Field Report at 5-6. It turns out that there were no drugs in the car, but the troopers did find two pistols, ammunition, and cash in the trunk. *Id.* at 6, 10-11.

Based on the two stops and other evidence, Phillips was later charged with willfully engaging in the business of dealing firearms without a license, 18 U.S.C. § 922(a)(1)(A) and 2; interstate travel in furtherance of unlicensed dealing in firearms, 18 U.S.C. § 924(n) and 2; illegal transportation of a firearm purchased outside of his state of residency, 18 U.S.C. §§ 1922(a)(3) and 924(a)(1)(D); possession of a firearm by a prohibited person, 18 U.S.C. § 922(g)(1); and obstruction of justice, 18 U.S.C. § 1512(c)(1) and 2.

---

[6]Mayerbock wrote Phillips a warning for following too closely to another vehicle, in violation of 625 ILCS 5/11-710(a), and for crossing a lane boundary unsafely, in violation 625 ILCS 5/11-709(a). R. 110-5, Gov.'s Exh. 5, Written Warning.

## II. Legal Standard

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. This "protection extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Thus, even when a police officer pulls over a vehicle for a brief traffic stop, the "officer must have at least an articulable and reasonable suspicion that the particular person stopped is breaking the law." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667-68 (7th Cir. 2018) (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1970)) (cleaned up).[7]

The Fourth Amendment also protects against warrantless searches, "unless one of a few specifically established and well-delineated exceptions applies." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) (citing *Arizona v. Gant*, 556 U.S. 332 (2009)). One exception to the warrant requirement is the automobile exception, which authorizes an officer to conduct a warrantless search of a car if there is probable cause to believe it contains contraband or evidence of a crime. *Id*. When probable cause exists to search a car, officers are allowed to search any part of the car that might contain contraband, including closed compartments, container, packages, and trunks. *Id*.

---

[7]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

If a search or seizure violates the Fourth Amendment, a court will generally exclude the evidence arising from the search and seizure. *United States v. Wilbourn*, 799 F.3d 900, 910 (7th Cir. 2015); *see also Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963). Whether reasonable suspicion or probable cause existed at the time of the stop is determined by a totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

### III. Analysis

Phillips argues that both of the stops violated his Fourth Amendment rights. The Court will address each stop in turn.

### A. July 9, 2017

For the July stop, Phillips argues that the firearms and ammunition recovered from the Challenger must be suppressed for three reasons: (1) the officers lacked reasonable suspicion or probable cause for the traffic stop; (2) the stop was unreasonably prolonged; and (3) the officers lacked probable cause to search the car. Mot. Suppress 7/9/17 Stop at 4-15.

### 1. Reasonable Suspicion for the Traffic Stop

"To support an investigatory stop, officers need only reasonable suspicion— that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015) (quoting *Heien v. North Carolina*, 574 U.S. 54, 61 (2014)) (cleaned up). "The standard takes into account the totality of the circumstances—the whole picture." *Id*. (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)) (cleaned up). The Seventh

Circuit has held that the suspicion that a defendant committed a traffic offense in violation of the Chicago Municipal Code is sufficient to create reasonable suspicion to support an investigatory stop. *See, e.g., Shields*, 789 F.3d at 745 ("Because Mr. Shields does not dispute that he violated the Chicago Municipal Code by parking in the cross walk, the officers clearly had an objective basis to believe that he was violating the law."); *see also United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) ("Probable cause exists when the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.") (cleaned up).

In its briefing, the government contended that Officers Farias and Butkovic had reasonable suspicion to believe that Phillips violated two sections of the Chicago Municipal Code: (1) § 9-76-090(A) for failure to dim lights when parked; and (2) § 9-40-200(A) for failure to use a turn signal. The first proposed reason fails as a matter of law: Phillips could not have violated § 9-76-090(A) because two independent elements of that code section were not met. First, the section says that "[w]henever a vehicle is lawfully parked at nighttime upon any lighted street within a business or residence district, no lights *need be displayed* upon such parked vehicle." MCC § 9-76-090(A) (emphasis added). So Phillips' decision to keep his headlights on is not *prohibited* by the statute; instead, the ordinance *allows* a driver to turn off the headlights when parked, but does not ban keeping the lights on. Second, Phillips was not "parked," as defined by the Municipal Code. The Municipal Code defines "Parking (to park)" as "the standing of an *unoccupied* vehicle otherwise than temporarily for

the purpose of and while actually engaged in loading or unloading property or passengers." MCC § 9-4-010 (emphasis added). Because Phillips and Moore were inside the Challenger at the time of the stop,[8] as a matter of law the Challenger was not parked and there could be no violation of § 9-76-090(A).

The question then becomes whether the officers' belief that Phillips committed this traffic-related infraction can still serve as reasonable suspicion for justifying the stop. The answer is no, even though the Fourth Amendment does not demand perfection from police officers. *Heien*, 574 U.S. at 61. It is true that mistakes are inevitable, especially in fast-paced and high-pressure situations. *Id.* So mistakes of fact and law do not necessarily amount to Fourth Amendment violations. "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of relevant law. The officer may be reasonably mistaken on either ground. " *Id.* As with any Fourth Amendment analysis, the ultimate inquiry is one of reasonableness and any "mistakes—whether of fact or of law—must be *objectively* reasonable." *Id.* at 66 (emphasis in original).

Even allowing for leeway to make reasonable mistakes of law, the mistake here simply was not objectively reasonable. In *Heien*, the mistake of law arose from a statute that was ambiguous and open to competing interpretations. *Id.* at 67. In contrast, here the relevant section of the Municipal Code plainly stated that when a car is parked at night, no lights *need* to be displayed. No reasonable reading of that

---

[8]The government does not dispute that Phillips' car was occupied at the time of the alleged violation and concedes that the definition of "parked" discussed applies to § 9-76-090(A). *See* R. 140, Gov.'s Sur-reply at 4-5.

code section would *require* that Phillips turn his headlights off. The section also expressly defines a parked car as one that is *un*occupied. *See e.g., United States v. Thompkins*, No. 18 CR 664, 2019 WL 2327652, at *3 (N.D. Ill. May 31, 2019) (citing *Guinto v. Nestorowicz*, 2015 WL 3421456, at *2 (N.D. Ill. May 28, 2015) ("A reasonable officer in Nestorowicz's position would have known that Guinto was not illegally parked. The municipal code defines parking as 'the standing of an unoccupied vehicle.'")). In sum, then, the officers did not have reasonable suspicion to stop Phillips based on the purported headlights violation under § 9-76-090(A).

The legality of this stop thus turns on a much closer question: whether the officers had reasonable suspicion to stop Phillips for failing to use a turn signal, in violation of § 9-40-200(A). The government argues that Phillips failed to use a turn signal when he pulled into the parking spot on Throop Street. Phillips responds that the violation never occurred or—at the least—that the officers did not see that it occurred. This is not an open-and-shut issue because, as described earlier in this Opinion, the squad-car video from that night does not show the parking maneuver at all. *See* 7/9/17 Squad Car Video at 00:30. Instead, the first time that the Challenger appears on the squad-car video is when it has already stopped along the curb. *Id*. at 00:32-36.

Based on the remainder of the evidence, however, the Court is convinced that Phillips committed the traffic violation and that Officer Butkovic saw it happen. This is a classic case of the circumstantial evidence standing alone presenting a close call, but the in-court testimony providing the ultimate answer. Officer Butkovic's in-court

testimony was credible: his answers were direct (when the questions were clear); he was calm throughout the examinations; and he reasonably acknowledged when he did not remember facts about that night or did not know the answer to questions. Based on the live testimony, the Court credits Butkovic's testimony that he saw the Challenger pull into the parking spot without using a turn signal after the officers drove through the vacant lot, and just as they began to turn onto Throop. Also, circumstantial evidence supports Butkovic's testimony: the squad-car video shows that (1) the Challenger's brake lights are still on when the officers drove onto Throop; (2) the tail-lights of the car flash briefly as the gears are shifted into park; and (3) the brake lights then turn off. That sequence supports the inference that the Challenger had only just moments before pulled to the curb, because Phillips's foot was still on the brakes and he was shifting the car into park when the squad-car video captures the Challenger. And if the Challenger has just moments ago pulled to the curb, then Butkovic could have seen it do so. It is also worth pointing out, as another piece of circumstantial evidence, that Phillips did not dispute Farias when, during the traffic stop, Farias accused Phillips of failing to use his turn signal when pulling into the parking lane.

Against this, Phillips primarily contends that the tight timeline makes it impossible that the officers saw Phillips pull into the parking spot at all, let alone without a turn signal. Phillips points out that it took the officers around 19 seconds to drive across the vacant lot. During this time, the officers could not see the Challenger, meaning it had already driven past the lot and was somewhere between

the end of the lot and the parking spot—which was not a very long distance at all, around the width of a basketball court plus the width of a house or so (as shown on the squad-car video). The officers themselves only took around 10 seconds to drive from the lot to where the Challenger was. In Phillips' view, then, it simply was impossible that Phillips took 19 seconds to get from the mouth of the vacant lot to the parking spot. Add to that, Phillips argues, the unreasonable mistake of law for the purported head-lights violation, which suggests that the officers were trying to make-up a reason for the stop.

But of course it was not literally impossible for Phillips to have taken that much time to get to the parking spot; it just means that he drove slowly, or even paused, as he made his way to the spot. And it is not difficult to conceive of reasons why Phillips would have driven slowly or paused as he reached the house: he and Moore had been told that gun shots had been fired nearby, so caution was warranted. Or maybe Phillips slowed down or paused as he figured out where to park, because there were already cars parked on both sides of the street. And Phillips likely did have to slow the car down to accomplish the parking maneuver. Also, as discussed earlier, based on the illuminated brake lights and gear shifting, in Phillips' account, he had driven the car to a stop in the parking spot but decided, for some reason, to not put the car in park and to just keep stepping on the brake for several seconds. It is true that the wrong-headed head-lights ticket provides the Court serious hesitation in crediting the officers' version of the events. But, all in all, these facts do not undermine Butkovic's credible in-court testimony, against which the defense did not

offer any of their own witnesses, as well as the rest of the circumstantial evidence.[9] In sum, the officers had reasonable suspicion to stop Phillips for failing to use a turn signal when moving into the parking spot.

## 2. Length of the Traffic Stop

Phillips contends that, even if the officers had reasonable suspicion for the stop, his Fourth Amendment rights were still violated because the officers unreasonably prolonged the stop to search his car. Mot. Suppress 7/9/17 Stop at 7-11. The government responds that the length of the July stop was supported by reasonable suspicion that firearms were inside the car after recovering the magazine from Moore. Gov.'s Resp. Br. at 10-13. The Court agrees.

"A traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission" of the stop. *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019) (quoting *Rodriguez v. United States*, 135 S.Ct. 1609, 1614–15 (2015)) (cleaned up). But the issuance of a ticket is not an officer's only objective during a traffic stop. *See Rodriguez*, 135 S.Ct. at 1615. Officers may also engage in "ordinary inquiries incident to the traffic stop," such as checking the driver's license and confirming proof of insurance. *Id*. (quoting *Illinois v. Caballes*, 543 U.S. 405, 408, (2005)) (cleaned up). Checking the criminal histories of the

---

[9]Phillips also argues that the timing was too tight because it was not until around 30 seconds into the squad-car video that Butkovic saw the Challenger pulling in the parking spot without a turn signal (remember that the video camera was not pointed at the Challenger at that time), and then just one second later, the Challenger is already in the parking spot. Again, however, that is consistent with Butkovic's testimony that he saw the Challenger as it pulled into the parking spot and then stop, because it would take no more than a second for the Challenger to pull head-first into the spot.

occupants of a car during a traffic stop is also permissible, even without reasonable suspicion. *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015). Indeed, checking criminal histories is "a procedure in itself normally reasonable, as it takes little time and may reveal outstanding arrest warrants." *Id*. An officer may also order a driver and passengers out of the car during a traffic stop because of the "weighty interest in officer safety" and the inherent dangers of traffic stops. *Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997).

Phillips concedes that the officers were allowed to check his license and insurance and run criminal history checks on both him and Moore. *See* Mot. Suppress 7/9/17 Stop at 8; Def.'s Reply Br. at 4-5. Phillips contends, though, that once the officers completed those tasks, Phillips should have been free to go, regardless of Moore's outstanding arrest warrant. *Id*. And so the stop, from that point on, was unreasonably prolonged. But what the officers did right after the officers checked Phillips' information and found Moore's arrest warrant was reasonably related to addressing the discovery of the arrest warrant. The focus of the stop shifted to arresting Moore. While that arrest was underway, it was reasonable for Officer Farias to ask Phillips to get out of the car and remain outside of it while the officers searched the car, particularly after recovering the firearms magazine from Moore. All of this happened in the context of the earlier report of shots fired. And, as explained later in the Opinion, the discovery of the magazine gave the officers probable cause to search the car.

In support of his argument, Phillips points to Farias' statements, as captured on the officer's body camera, while checking Phillips' and Moore's information. Mot. Suppress 7/9/17 Stop at 10. In the recording, Farias can be heard saying that he was "trying to find something" but "can't force it." Farias Body Camera Video at 05:33-39. The problem with this argument is that an officer's subjective intent plays no role in the Fourth Amendment analysis. *See United States v. Taylor*, 596 F.3d 373, 377 (7th Cir. 2010) (noting that that argument has been repeatedly rejected by the Supreme Court) (citing cases). Instead, the question is whether the stop was *objectively* reasonable. As explained above, the license, insurance, and warrant check were all objectively reasonable as a matter of law, and that in turn led to the discovery of the outstanding warrant for Moore. The warrant then authorized the officers to arrest and to search Moore, which then led to the discovery of the magazine and (as explained next) to the ensuing search of the car.

### 3. Probable Cause to Search the Car

Before getting to the ultimate search of the car, Phillips first argues that the officers illegally searched the Challenger at various times without consent or a search warrant. Mot. Suppress 7/9/17 Stop at 11. Phillips contends that Officer Farias initially searched the car by pointing his flashlight into the driver and passenger sides of the car immediately after the officers arrested Moore but before they recovered the magazine. *Id*. (citing Farias Body Camera Video at 08:31-38; *id*. at 10:25-39). But nothing was recovered during these "searches" (if they can even amount to that), so there is no evidence to suppress.

As for the remaining searches, those occurred *after* Butkovic recovered the magazine, at which point the automobile exception applied. The automobile exception permits warrantless searches of vehicles when police have "probable cause to believe it contains evidence of criminal activity." *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (citing *Arizona v. Gant*, 556 U.S. 332, 338 (2009)); *see also Williams*, 627 F.3d at 251. "Probable cause exists when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *Charles*, 801 F.3d at 860. For the search to be proper, there only has to be a "fair probability" that contraband or evidence of a crime would be found in the car; "absolute certainty of such a discovery is not required." *Williams*, 627 F.3d at 251. The authority to search under the automobile exception "encompasses any area of the vehicle where evidence of the crime might be found." *Id*. This includes containers within the car that could hold the evidence. *Id*.

After the officers found a loaded magazine on Moore, there was a fair probability that a gun would be found in the Challenger. Butkovic recovered a loaded magazine from Moore's pocket but no gun. A reasonably prudent officer would search the car for a gun at that point. What's more, the seizure of the magazine happened around 30 minutes after reports of shots fired in the area. Moore and Phillips even admitted during the stop that they knew that shots had been fired in the area earlier that night. Taken together, these facts gave the officers probable cause to believe that

there was a gun in the car. The searches that yielded the two firearms and ammunition were reasonable under the automobile exception.

## B. August 24, 2017

Moving on to the second motion, Phillips contends that the evidence obtained from the Challenger during the August 24, 2017 stop should also be suppressed because the stop and search violated the Fourth Amendment. Specifically, Phillips contends that (1) he was seized without either reasonable suspicion or probable cause because the alleged traffic violations did not occur; (2) the stop was unreasonably prolonged; and (3) the state troopers did not have probable cause to search his car because the dog alert was unreliable. In response, the government argues that the traffic violations and the dog alert were not even needed to justify the stop and search because the state troopers had reasonable suspicion to stop the car and then probable cause to search it under the collective knowledge doctrine. The Court agrees.

### 1. Collective Knowledge

"The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *Williams*, 627 F.3d at 252; *see also United States v. Khan*, 937 F.3d 1042, 1052 (7th Cir. 2019) (citing *United States v. Hensley*, 469 U.S. 221, 232–33 (1985). This doctrine is rooted in the idea that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly,

cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *United States v. Hensley*, 469 U.S. 221, 231 (1985). To rely on the doctrine, the government must show that (1) the officer acted in objective reliance on the information received; (2) the officer providing the information, or the agency for which the officer works, had facts supporting the level of suspicion required; and (3) the stop was no more intrusive than would have been permissible for the officer requesting it. *Williams*, 627 F.3d at 252-53.

Phillips disputes only the first and second elements. It makes sense for the Court to address the second element first because if the ATF did not have reasonable suspicion to stop the car or probable cause to search it, then it is inconsequential whether Mayerbock relied on the information he received from Montes as a basis for the stop and search. As discussed earlier, probable cause requires only a "fair probability" that contraband or evidence of a crime; "absolute certainty of such a discovery is not required." *Williams*, 627 F.3d at 252. Reasonable suspicion is "something less than probable cause but more than a hunch." *United States v. Baskin*, 401 F.3d 788, 1791 (7th Cir. 2005).

The ATF had ample evidence to support both the stop and the search of the Challenger. As detailed earlier in the Opinion, by the time of the August stop, the ATF had first-hand witness statements connecting the Challenger to at least six separate illegal firearms deals that took place in Kentucky between January 2017 and July 2017 (and the number of deals is seven if the modest inconsistency between a Dodge Charger and Dodge Challenger is set aside in light of the probable-cause

standard). The witnesses identified the Challenger as the vehicle that either Phillips or Henderson used at the gun deals. It is true that Phillips himself was only identified in *one* transaction that happened around seven months before the stop. *See* Def.'s Reply Br. at 9. But the Challenger was the consistent means of transportation to each of the gun deals. Also, in terms of the recency of the evidence, during the July 9, 2017 stop of the Challenger, law enforcement recovered firearm parts from two of the gun deals connected to the Challenger. On top of all that evidence, the ATF also knew, based on surveillance footage and GPS tracking data, that Phillips used the Challenger to drive to Kentucky just two days before the stop occurred in Illinois and that Henderson had made the same trip contemporaneously in a separate car. Two days later, the ATF agents saw Phillips participate in a meeting with an unidentified man in a hospital parking lot. The agents saw Phillips place something into the other person's car, and then they parted ways after the other person looked around the parking lot. Just two hours after that meeting, the tracker data showed the Challenger driving north from Kentucky towards Illinois. When viewed together, under the totality of the circumstances, this was more than enough probable cause to believe that the Challenger contained evidence of the unlawful transportation and trafficking of firearms. *See, e.g., United States v. Garrett*, 757 F.3d 560, 567 (7th Cir. 2014). So probable cause supported both the stop and the search of the Challenger.

Even if the evidence was not enough on its own to support the stop and search, the traffic violations and Phillips' behavior during the stop in combination with the ATF's evidence was certainly enough to justify both the stop and the search. On

review of the squad-car video, the Court finds that the video does show the Challenger following too closely behind the car in front of it, in violation of 625 ILCS 5/11-710(a), and shortly after that, cutting over very quickly over into another lane, in violation of 625 ILCS 5/11-709(a). *See* 8/24/17 Squad Car Video at 07:13:00; 07:24:00. That was enough to justify the traffic stop. *See Shields*, 789 F.3d at 745.

Then, Phillips' contentious and nervous behavior throughout the stop, in combination with the information Mayerbock learned from Montes, was enough to justify the ensuing search. For example, Phillips repeatedly refused to comply with Mayerbock's request that he get out of the car. Mayerbock also noticed that, throughout the stop, Phillips was using his cell phone to communicate with another person, and specifically noted that Phillips was nervous when relaying his location to that individual. And while a display of nervousness alone is usually insufficient to support a finding of probable cause, it can be "a sign that a suspect has something to hide, including a weapon." *United States v. Lyons*, 733 F.3d 777, 782 (7th Cir. 2013) (quoting *United States v. Patton*, 705 F.3d 734, 740 (7th Cir. 2013)); *see also United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir.2010). So Phillips' nervousness and his refusal to get out of the car (despite being offered to just get a traffic warning rather than a ticket), together with the information that Mayerbock obtained from Montes, gave rise to a "fair probability" that evidence of an illegal firearms deal would be found in the Challenger.

Having determined that the ATF had reasonable suspicion (and, indeed, even probable cause) to stop the Challenger and probable cause to search it, the next

question is whether that knowledge could be imputed to Mayerbock. The answer is yes. Courts have applied the collective knowledge doctrine where, as here, federal agents ask local law enforcement officers to stop a specifically identified car, but did not relay all of the facts underlying the federal agency's probable cause. *See Williams*, 627 F.3d at 252. For example, in *Williams*, the DEA together with a team of officers from the Chicago Police Department were investigating a drug trafficking operation. 627 F.3d at 249. CPD Officer Daniel Gutierrez, a member of the DEA task force, was responsible for coordinating the DEA's efforts with CPD. *Id*. Before an anticipated drug deal, Gutierrez met with a number of CPD officers, including CPD Officer Joseph Simon, and told them that he would provide them with information about the suspect vehicle, and that they should stop the vehicle after developing their own probable cause. *Id*. While conducting surveillance of the residence where the drug deals were believed to be taking place, members of the DEA task force, including Gutierrez, saw the defendant arrive in a Chevy Suburban, enter the backyard carrying a brown shoebox, and then leave fifteen minutes later carrying the same box. *Id*. at 249-50. Gutierrez then called Simon and gave him a description of the defendant's vehicle and license plate, and informed him what direction the vehicle was heading. *Id*. at 250. Simon eventually stopped the defendant's vehicle, searched it, and found cocaine in the shoebox the defendant had been seen holding. *Id*. Based on these facts, the Seventh Circuit concluded that the search was supported by probable cause because the DEA's collective knowledge could be imputed to Simon under the collective knowledge doctrine. *Id*. at 252.

Like in *Williams*, here, Montes asked Mayerbock to assist with a traffic stop, identified Phillips' Challenger as the suspect car, and provided him with facts from the underlying investigation. Specifically, Montes identified the Challenger as a car that may contain unlawful guns or drugs, and informed Mayerbock that Phillips, a convicted felon, might be the driver. An objective interpretation of that information would lead Mayerbock to believe that the stop and search was permissible. *See, e.g, Williams*, 627 F.3d at 252; *see also United States v. Roman*, 626 Fed. App'x 177, 180 (7th Cir. 2015) (holding that the DEA had at least reasonable suspicion to stop defendant's vehicle "[a]nd by acting at the DEA's direction, the officers who were following [defendant's] car could rely on the DEA's knowledge and stop it").

Phillips attempts to distance this case from *Williams* based on the fact that the ATF and CPD did not work closely together on this investigation. Phillips points out that, in *Williams*, the DEA and CPD formed a task force to investigate the underlying drug conspiracy. But this argument is wrong. For one thing, the arresting officer (Simon) in *Williams*, like Mayerbock, was not part of the task force and only received information about the investigation on the day of the stop. And either way, *Williams* does not stand for the proposition that agencies *must* work in coordinated efforts before the doctrine can apply—that would defeat the purpose of the doctrine, which is to allow law enforcement officers to rely on each other in order to act swiftly when crime is afoot.

According to Phillips, the facts underlying the stop here are instead akin to those in *United States v. Wilbourn*, 799 F.3d 900 (7th Cir. 2015). In *Wilbourn*, ATF

agents were working together with local officers to investigate a drug conspiracy. 799 F.3d at 905-906. But in that case, the arresting officers had *no* communication at all with any officers involved in the federal investigation, nor were they part of the investigation team. *Id*. at 909. ("There is no indication that they were present at the gas station when Officer Munyon observed the encounter between the passenger and the Dodge. There is no evidence that the officers derived their suspicions as a result of facts provided to them by the other agents."). The arresting officers therefore were not relying on information from the investigation; rather they arrived at their own conclusion that probable cause existed to stop and arrest the defendant based on their own observations. *Id*. But that is not what happened here. As discussed, Montes was in close communication with Mayerbock and relayed sufficient information about the ongoing investigation to him. So *Wilbourn,* despite some of its similarities in background facts, is inapplicable.

Phillips also contends that the collective knowledge doctrine does not apply here because Mayerbock did not stop the Challenger at Montes' direction and instead did so because Mayerbock observed traffic violations. *See* Def.'s Reply Br. at 2 (citing R. 110-7, Gov.'s Exh. 7, 8/24/17 Arrest Report). But it has long been established in this Circuit, and in others, that "the application of the collective knowledge doctrine is unaffected by an officer's use of a cover story to disguise a stop as a mere traffic stop." *Williams*, 627 F.3d at 253 (citing cases).

Lastly, Phillips argues that Montes failed to formally order Mayerbock to stop the Challenger. Def.'s Reply Br. at 2-3. In support of this theory, Phillips points to

*Celio* and *Rodriguez*, two Seventh Circuit decisions that applied the collective knowledge doctrine where the agency requesting the stop directly ordered the executing officer to stop the car. *See id.* at 3 (citing *United States v. Celio*, 945 F.2d 180, 182 (7th Cir. 1991); *United States v. Rodriguez*, 831 F.2d 162, 165 (7th Cir. 1987)). Relying on these cases, Phillips contends that collective knowledge *requires* that a formal order be given before an officer can act. But neither of those cases stand for such a narrow proposition. And in fact, the Seventh Circuit has explicitly rejected Phillips' argument. *See United States v. Nafzger*, 974 F.2d 906, 915-16 (7th Cir. 1992) ("Argue received sufficient information at the briefing—he knew that officers who investigated the activities of the crime ring suspected the defendant was involved and that the crime was continuing. This was enough; they need not have added a specific request or command before Argue could act."). The collective knowledge doctrine justified the stop and the search.

## 2. Length of the August Stop

Lastly, Phillips contends that Mayerbock unreasonably prolonged the stop by falsely telling Phillips that his license was suspended in order to wait for the dog sniff. 8/24/17 Mot. Suppress at 6. But, as Phillips acknowledges, Mayerbock told Phillips his license was suspended as a way to get Phillips out of his car, which Phillips was refusing to do. As explained earlier, an officer may order a driver out of the car during a traffic stop because of the risk to officer safety. Phillips could not lawfully refuse, so all Mayerbock did was resort to something less than force to get Phillips out of the car. Indeed, here the risk to officer safety was higher than in an

ordinary traffic stop—there was probable cause to believe that the Challenger contained illegal guns. Mayerbock knew that the Challenger had been used in firearms transactions in the past and that it had been used in what was suspected to be another transaction just a couple of hours before the stop occurred. The alleged "delay" in issuing the traffic-violation warning (if three minutes can be characterized as a delay), ironically can be attributed to Phillips' own refusal to get out of the car. Then, mere *seconds* after Phillips got out of the car, Muzzillo arrived with Maverick. 8/24/17 ISP Squad Car Video at 09:03:00. The dog sniff then happened while Mayerbock was still questioning Phillips in relation to the traffic warning. *Id.* at 08:45:00-09:04:00. The stop was not unreasonably prolonged.

## IV. Conclusion

For the reasons discussed above, the Court denies both motions to suppress. The status hearing of January 9, 2020 remains in place to discuss the next steps in the case.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 1, 2019